UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**FILED**

NOV 2 3 1999

U. S. DISTRICT COURT
E. DIST. OF MO.
ST. LOUIS

| | | |
|---|---|---|
| JESSE ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:98CV1542 ERW |
| | ) | |
| ALUMAX FOILS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Alumax Foils, Inc.'s Motion for Summary Judgment [document #41] and Motion to Strike [document #43].

In his First Amended Complaint, Plaintiff Jesse Adams alleges in Counts I and II that Alumax violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1) et seq. ("Title VII") and the Missouri Human Rights Act R.S. Mo. § 213.055(1) ("MHRA"), respectively, by subjecting him to racial harassment and to disparate treatment in the terms and conditions of his employment because he is black, as well as discharging or constructively discharging him. In Counts III and IV, Adams claims that Alumax violated Title VII and the MHRA, respectively, by reprimanding and terminating him in retaliation for his complaints about Alumax's discriminatory practices.[1]

## I.   STATEMENT OF GENERAL RELEVANT FACTS

Viewing the facts of this case in the light most favorable to Adams, the Court sets forth the following general facts:

---

[1]     Because federal employment discrimination decisions are applicable and authoritative under the MHRA, Tart v. Hill Behan Lumber Co., 31 F.3d 668, 671 (8th Cir. 1994), the Court shall analyze Adams's Title VII and MHRA race discrimination claims jointly.

Adams began his employment at Alumax on March 11, 1996, as a Mill Operator Trainee Helper ("M.O.T.H."). In August, 1997, he was promoted to the position of mill operator. Subsequently, Adams sought a promotion to a roll grinder position. Under the collective bargaining agreement between Alumax and its union employees, employees can bid for certain positions, which are filled based on seniority. The roll grinder position, however, is not biddable; instead, Alumax's policy is that employees who seek this position must be recommended by their supervisors. When Darrell Casteel, who was then Rolling Mill Superintendent, asked the various supervisors to recommend employees for the available roll grinder position, Mike Droege, Adams's supervisor, did not recommend Adams or any other of the fifteen employees he supervised. Ultimately, Joe Boone, an employee on a different shift, was recommended and promoted to roll grinder.

The parties dispute the reasons for Alumax's decision to promote Boone instead of Adams. Alumax claims that Boone received the promotion because he had an excellent attendance record, good mechanical abilities, and a good attitude toward work, while Adams had an absenteeism problem, unsatisfactory work performance and a poor attitude. Adams maintains that Alumax's belief that he had an absenteeism problem resulted from the company's practice of disciplining black employees more harshly than white employees. Adams further asserts that Alumax has recently changed its reasons for not promoting him, adding its charges of poor work performance and attitude to its original reason--absenteeism. Adams also asserts that he was better qualified than Boone for the roll grinder position because he had more education and more experience performing some of a roll grinder's responsibilities than did Boone.

On December 8, 1997, Adams filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), the City of St. Louis Civil Rights Enforcement Agency, and

2

the Missouri Commission on Human Rights.[2]  In his Charge, Adams claimed that Alumax had discriminated against him because he is black; that Alumax had denied him a promotion to roll grinder in October, 1997 because of his race; and that Alumax was discriminating against him in the terms and conditions of his employment by disciplining him for tardiness and for missing work but not disciplining white employees for similar conduct.

Adams alleges that after filing this Charge, he experienced a series of events which included someone tampering with his machine, his M.O.T.H. (assistant) not acting as an effective helper, being ordered to perform demeaning, difficult tasks which white workers were not required to do, his vehicle being scraped and damaged in the parking lot, intimidation by a co-worker who displayed to Adams a gun he had brought to work, and his supervisor's refusal to speak to or interact with him.

Additionally, Adams alleges that he was demoted a few weeks after filing the Charge when he was moved from his mill operator position to a M.O.T.H. position.  Alumax counters this claim by asserting that the collective bargaining agreement permits the company to move the most junior mill operator to a M.O.T.H. position when a reduction occurs in a mill operator job.  Alumax asserts that in January, 1998, it took Mill 137 down from a three-shift operation to a two-shift operation due to lack of work and, as a result, Adams was displaced by a more senior mill operator and temporarily placed in a M.O.T.H. position.  Alumax further claims that Adams would have been returned to a mill operator position when Mill 137 was taken back up to three shifts.  Adams appears to question whether Alumax indeed ran Mill 137 on a two-shift operation during the relevant time period,

---

[2]     Adams had initiated the filing of this Charge on October 25, 1997, when he completed a Charge Questionnaire, claiming various acts of race discrimination by Alumax. Adams had also filed a union grievance on October 27, 1997, complaining that his supervisor, Droege, had yelled at him in an unprofessional manner after his mill malfunctioned and destroyed 1000 pounds of metal while Adams's M.O.T.H. was operating the mill. Droege denied this grievance on October 28, 1997.

asserting that the manning sheets on which Alumax relies for this contention are, in general, an unreliable source of evidence.

On January 15, 1998, after the schedule moving Adams from mill operator to M.O.T.H. was posted, Adams told Droege that he believed he should be allowed to keep his mill operator position and that he wanted to file a grievance. Droege informed him that he had to take the open M.O.T.H. position. On January 16, Adams complained that he was feeling sick; he called in sick the next two days and then did not call in or report to work again. Adams contends that his demotion to M.O.T.H. constituted a constructive discharge in retaliation for his filing an EEOC Charge against the company. Alumax asserts that Adams contacted Ken Ramsey, the company's former Industrial Relations manager, and voluntarily resigned on January 20, 1998. Adams vigorously denies having contacted Ramsey.

## II.     SUMMARY JUDGMENT STANDARDS

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Id. at 327 (quoting Fed. R. Civ. P. 1).

In order to obtain summary judgment, the moving party must demonstrate "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the moving party carries this burden, the nonmoving party must "do more than simply show there is some

4

metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on allegations or denials in the pleadings, but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> at 587 (quoting Fed .R .Civ .P. 56(3)).

In analyzing summary judgment motions, the Court is required to view the facts in a light most favorable to the non-moving party, and must give the non-moving party the benefit of any inferences that can logically be drawn from those facts. <u>Matsushita</u>, 475 U.S. at 587; <u>Buller v. Buechler</u>, 706 F.2d 844, 846 (8th Cir. 1983). Moreover, this Court is required to resolve all conflicts in favor of the non-moving party. <u>Robert Johnson Grain Co. v. Chemical Interchange Co.</u>, 541 F.2d 207, 210 (8th Cir. 1976). The trial court may not consider the credibility of the witnesses or the weight of the evidence. <u>White v. Pence</u>, 961 F.2d 776, 779 (8th Cir. 1992).

## III.   ANALYSIS

### A.   Adams's Failure to Promote Claim

Adams alleges that Alumax refused to promote him to the open roll grinder position because he is black and instead promoted a less qualified white employee, Joe Boone. In employment discrimination cases such as this one based upon indirect evidence of discrimination, courts utilize the burden-shifting scheme set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Vaughn v. Roadway Express, Inc.</u>, 164 F.3d 1087, 1089 (8th Cir. 1998). Under this three-step analysis, the plaintiff must first present a prima facie case of discrimination. <u>Id.</u> at 1090. If the plaintiff does so, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to rebut this presumption through the articulation of a legitimate, nondiscriminatory reason for the employment action. <u>Id.</u> (citing <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993)). If the defendant advances a nondiscriminatory reason for its employment action, the

5

presumption disappears, leaving the plaintiff with the burden of demonstrating both "that the employer's proffered reason is pretextual and that 'he has been the victim of intentional discrimination.'" Id. (citing Hicks, 509 U.S. at 508).

To establish a prima facie case of intentional race discrimination in a failure-to-promote case, Adams must produce competent evidence sufficient to establish the following elements:  (1) that he is a member of a racial minority; (2) that he was qualified and applied for promotion to an available position; (3) that he was rejected; and (4) that white employees similarly situated to him were not so treated.  Rose-Maston v. NME Hospitals, 133 F.3d 1104, 1109 (8th Cir. 1998).  Alumax challenges the sufficiency of Adams's evidence as to the second and fourth of these required elements, arguing that because Adams was excessively tardy and absent, and had been disciplined for these violations of the company's attendance requirements, he was neither qualified for the promotion to roll grinder nor similarly situated to Joe Boone, who, Alumax asserts, had a good attendance record.

Employees at Alumax's plant, which runs constantly with the exception of a few holidays, maintain a rigorous schedule, working for twenty-eight days straight before receiving time off.  This demanding schedule makes absenteeism a significant issue for both Alumax and its employees. According to Alumax's Standard Policy and Procedure, any employee who is absent without excuse is assessed three points.  An employee who arrives late or leaves early receives one point.  An employee who amasses a total of nine points within any running ninety-day period is subject to progressive discipline.  Adams was subject to such progressive discipline, receiving an oral warning in August, 1996, a written warning in October, 1996, a final written warning in January, 1997, and a final written warning in lieu of suspension in early October, 1997, shortly before he sought the roll

grinder position.  Adams received the points which led to this progressive discipline for missing work, returning late from lunch, and leaving early.

Although this evidence on its face appears to support Alumax's contention that Adams's absenteeism disqualified him from the roll grinder position, Adams submits that it did not.  First, Adams points out that for any biddable jobs in the plant, an employee with a "final written warning in lieu of suspension" could still bid for and move into an open position for which he was qualified by seniority and ability.  Second, Adams notes a significant subjective element to this discipline process.  Although the times at which employees clock in and out of work are recorded by a computer, the computer's report of absences and tardiness is verified by each employee's supervisor, who checks his personal notebook to determine whether that conduct was excused or unexcused and, therefore, whether to assess the employee disciplinary points.  Both Adams and Martino Grandelious, another black employee, testified in their depositions that supervisors favored white employees, particularly their friends, by routinely excusing their lateness and absences, conduct they did not as frequently excuse for black employees.  Third, Adams points to Darrell Casteel's deposition testimony that some employees with absentee problems had been recommended for and received the position of roll grinder.  These white employees had absentee problems for various reasons--youth, difficulty adjusting to the demanding work schedule, and personal problems including alcoholism and marital difficulties.  Fourth, and most significantly, Adams presents an analysis of the supervisors' logbooks which compares the number of times employees were noted late in reporting for work or late from lunch, won't be in or no show, or left early--and the attendance points assigned to these employees.  Of the forty-three employees listed, the three employees with the most attendance points assigned are all black--Adams, Grandelious, and Ronald Claybrook, with fifteen, five, and three points, respectively.  (Two other white employees, Queen and James (first

7

names are not listed), also had three attendance points assigned.)  White employees with notations of absences and tardiness records similar to that of Adams had fewer or no points assigned.[3]

The Court finds this evidence, which Alumax neither challenges nor refutes, sufficient to support Adams's contention of a disparate application of the company's attendance policy and, accordingly, adequate to establish that he was qualified for the promotion to roll grinder.  Adams's evidence demonstrates not only that his absenteeism might not have been an obstacle to his promotion were he white but also that he might not have received the points and resulting disciplinary action that he did for his absences were he white.

The Court further believes that Adams has established the fourth element of a prima facie case of promotion denial, by showing that he was similarly situated to Joe Boone, who received the roll grinder promotion.  Adams offers evidence from the company's time records, indicating occasions on which he was written up and given points for returning late from lunch, while Boone was a few minutes later returning from lunch and received no discipline.  Additionally, Adams's comparison drawn from the supervisors' logbooks, described *supra*, indicates that Boone received no attendance points for two times late or late from lunch and for eleven times won't be in or no show.  Furthermore, the Court agrees with Adams that the record demonstrates that Alumax has consistently assigned Adams's absenteeism as its reason for not promoting him, and only recently

---

[3]         For instance, while Adams was assigned fifteen points for seven times late or late from lunch, for nine times won't be in or no show, and for five times left early, Coleman was assigned only two points for twenty-seven times late or late from lunch, for five times won't be in or no show, and for one time left early.  Veath was assigned no points for eighteen times late or late from lunch, for ten times won't be in or no show and for one time left early.  Margraff was also assigned no points for twelve times late or late from lunch, for eight times won't be in or no show, and for two times left early.  The Court does note that Claybrook's three points were assigned for twenty-five times late or late from lunch, for three times won't be in or no show, and for one time left early, while Grandelious's five points were assigned for four times late or late from lunch, for twenty-four no shows, and for eight left earlies.  Pl. Ex. AA.

charges of poor work performance and a bad attitude.  Accordingly, the Court believes that comparing Adams's and Boone's experience, education, and attendance records, the two employees were similarly situated at the time they each sought the open roll grinder position.

Having found that Adams has presented a prima facie case of race discrimination on his failure to promote claim, the Court now must determine whether Alumax has rebutted this presumption through the articulation of a legitimate, nondiscriminatory reason for the employment action.  Vaughn, 164 F.3d at 1089 (citing Hicks, 509 U.S. at 506 (1993)).  The Court finds that Alumax has met this burden by asserting that it declined to recommend or promote Adams to the roll grinder position because of his excessive absenteeism.  Therefore, under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the burden now shifts back to Adams to demonstrate both that "that the employer's proffered reason is pretextual and that 'he has been the victim of intentional discrimination.'"  Vaughn, 164 F.3d at 1089 (citing Hicks, 509 U.S. at 508).

The Eighth Circuit recently summarized its description of the sufficiency of evidence of pretext required to withstand a summary judgment in Ryther v. KARE 11, 108 F.3d 832, 837 (8th Cir. 1997) (en banc) as follows:

> In Ryther, we stated that evidence of pretext will not by itself be enough to make a submissible case if it is, standing alone, inconsistent with a reasonable inference of [age] discrimination.  The plaintiff must still persuade the fact-finder that the employment decision was based upon intentional discrimination.  The overall evidence of pretext must allow a reasonable fact-finder to infer that the employer's adverse employment decision was motivated by discriminatory animus.

Vaughn, 164 F.3d at 1090 (quoting Ryther, 108 F.3d at 837) (internal citations omitted).  In making this determination of intentional discrimination, "the [Supreme] Court has recognized that in some cases the overall strength of the prima facie case in conjunction with evidence of pretext will be sufficient to permit a finding of intentional discrimination, while in other cases the prima facie case

in tandem with evidence of pretext will not be sufficient to permit a finding of discrimination."

Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1334-35 (8th Cir. 1996) (citing Hicks, 509

U.S. at 511, n.4).  Thus, on a motion for summary judgment, upon a finding that the plaintiff has

created a factual dispute as to the issue of pretext, the trial court must decide whether the evidence

is sufficient for a reasonable trier of fact to infer discrimination.  Rothmeier, 85 F.3d at 1335.  "If

the evidence considered as a whole does not satisfy that standard, then the plaintiff must come

forward with some additional facts beyond the showing of a prima facie case and pretext, that would

allow a jury reasonably to infer that the real reason for the adverse employment action was

intentional discrimination."  Id. at 1336.

In this case, the Court believes that the evidence reviewed in its discussion of Adams's prima

facie case is also sufficient to create a factual dispute as to the issue of pretext.  Adams has presented

evidence of Alumax's tolerance and promotion of white employees with attendance problems.

Adams has also set forth evidence indicating that Alumax supervisors used their discretionary ability

to excuse or not excuse absences and tardiness to favor white employees and penalize black

employees, particularly Adams.  In addition, Adams's evidence suggests that Boone's absence record

was not substantially dissimilar from his own, further undermining the legitimacy of Alumax's

contention that it promoted Boone over Adams because of Adams's absenteeism.  This evidence, as

well as Adams's and Grandelious's testimony that black employees were disciplined more strictly

for attendance problems than were favored white employees, raises a factual dispute as to whether

Alumax's stated reason for not promoting Adams was legitimate.  Moreover, the Court believes that

Adams's evidence of Alumax's disparate treatment of white and black employees in regard to its

attendance policy is also adequate to allow a reasonable trier of fact to infer intentional

discrimination.  For the foregoing reasons, the Court shall deny summary judgment as to Adams's

failure to promote claim. The Court shall also deny summary judgment as to Adams's closely related claim that Alumax discriminated against him in the terms and conditions of his employment with respect to discipline for absenteeism and tardiness.

B.    Adams's Administrative Exhaustion of his Constructive Discharge and Racial Harassment Claims

Adams alleges that Alumax discriminated against him by discharging him in retaliation for his objections to the company's discriminatory practices and by subjecting him to an offensive, hostile, and intimidating work environment in which he was harassed based on his race. Alumax asserts that both of these claims are outside the scope of his administrative charge and therefore beyond the scope of this Court's review. Before initiating a civil action under Title VII or the MHRA, a plaintiff must exhaust his administrative remedies by timely filing a charge of discrimination with the EEOC or corresponding state agency. See Williams v. Little Rock Mun. Works, 21 F.3d 218, 222 (8th Cir. 1994). As the Eighth Circuit has explained,

> Exhaustion requires a claimant to give notice of all claims of discrimination in the administrative complaint, but administrative complaints are interpreted liberally in an effort to further the remedial purposes of legislation that prohibits unlawful employment practices. We therefore deem administrative remedies exhausted as to all incidents of discrimination that are like or reasonably related to the allegations of the administrative charge. Thus, the scope of the civil suit may be as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination.

Tart, 31 F.3d at 671 (internal citations and quotations omitted).

Adams asserted three claims in his administrative charge. First, Adams claimed generally that Alumax had discriminated against him because he is black. Second, Adams alleged that the company had denied him a promotion to roll grinder in October, 1997 because of his race. Third, Adams alleged that Alumax was discriminating against him in the terms and conditions of his employment by disciplining him for tardiness and for missing work but not disciplining white

11

employees for similar conduct.  Adams did not allege that he was being racially harassed in his administrative charge, although he makes such a claim in Counts I and II of his First Amended Complaint.  Nor did he allege that he had been constructively discharged in retaliation for his complaint to the EEOC, although he makes such claims in Counts III and IV of his Complaint.  Alumax notes these discrepancies and further asserts that Adams's claims are not like or reasonably related to the allegations in his administrative complaint.  However, because each of these claims essentially alleges that Alumax retaliated against him for filing an administrative complaint, the Court believes that these claims are within the scope of his administrative complaint.

In Wallin v. Minnesota Dep't of Corrections, 153 F.3d 681, 688 (8th Cir. 1998), the Eighth Circuit stated that retaliation claims are not reasonably related to underlying discrimination claims in a plaintiff's administrative complaint, unless the retaliation claims "grew out of the discrimination charge he filed with the EEOC."  Adams alleges that after he filed his charge of discrimination, he suffered racial harassment by his co-workers and supervisors and ultimately was demoted to a M.O.T.H. position, an act which he claims constituted a constructive discharge.  Adams asserts that both the racial harassment and the constructive discharge occurred after he filed his administrative complaint and were in retaliation for his action.  Accordingly, the Court finds that Adams's constructive discharge and racial harassment claims are in fact alleged as retaliation claims which resulted from the filing of his administrative charge.  As such, these claims are reasonably related to the underlying discrimination claims in his administrative complaint.  Whether Adams may proceed to trial on each of these claims is the next matter for the Court's consideration.

C.    Adams's Retaliation Claims

To establish a prima facie case of retaliation, Adams must show that (1) he engaged in a protected activity; (2) Alumax took adverse action against him; and (3) a causal connection between

the two. <u>Scott v. County of Ramsey</u>, 180 F.3d 913, 917 (8th Cir. 1999). While Alumax concedes that Adams's demotion claim alleges an adverse employment action, the company argues that his retaliatory harassment claim does not rise to the level of an adverse employment action. The Court agrees.

Adams alleges that after he filed his administrative complaint, he suffered several instances of racial harassment, including someone tampering with his machine, his M.O.T.H. (assistant) not acting as an effective helper, being ordered to perform demeaning, difficult tasks which white workers were not required to do, his vehicle being scraped and damaged in the parking lot, intimidation by a co-worker who displayed to Adams a gun he had brought to work, and his supervisor's refusal to speak to or interact with him. In a recent case, the Eighth Circuit held that "without evidence of some more tangible change in duties or working conditions, general allegations of co-worker ostracism are not sufficient to rise to the level of an adverse employment action for purposes of Title VII." <u>Scusa v. Nestle U.S.A. Co., Inc.</u>, 181 F.3d 958, 970 (8th Cir. 1999). The Court of Appeals also cited with approval <u>Miller v. Aluminum Co. of America</u>, in which the district court held that snubbing by supervisors did not amount to unlawful retaliation. 679 F.Supp. 495, 505 (W.D. Pa. 1988). In another recent case, the Court of Appeals found that the plaintiff had not shown an adverse employment action by her claims that her co-workers treated her as a "pariah" after she filed an administrative complaint. The court reasoned that "[d]espite a change in the general tone of the workplace, [plaintiff] did not identify any reduction in her title, salary, or benefits." <u>Floyd v. State of Missouri Dep't of Social Services, Division of Family Services</u>, 188 F.3d 932, 938 (8th Cir. 1999). Based on these recent statements of the law by the Eighth Circuit, this Court concludes that Adams's claim that he was racially harassed by his co-workers and ignored by his supervisor does not rise to the level of an adverse employment action. In alleging this

13

harassment, Adams fails to identify any reduction in his title, salary, or benefits; instead, he alleges that he was hassled, intimidated, and generally treated badly by his co-workers. The Eighth Circuit has not accepted retaliatory harassment which does not cause a material employment disadvantage as an adverse employment action. Therefore, the Court concludes that Adams has not established a prima facie case with respect to his racial harassment claim.

Turning to Adams's constructive discharge claim, the Court first notes its agreement with Alumax that the alleged demotion which Adams asserts constituted a constructive discharge rises to the level of an adverse employment action. The Court further agrees with Alumax that Adams's has failed to establish the third element of a retaliation claim with respect to his constructive discharge allegation, because he has not demonstrated a causal connection between his filing of the administrative complaint and the company's decision to transfer him to the M.O.T.H. position.

In order to establish the third element of his prima facie case of retaliation, Adams must present evidence that Alumax "knew he had engaged in statutorily protected activity." Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998). However, Adams has not produced any evidence, beyond his own unsupported allegations, to demonstrate that the Alumax personnel who made the decision to transfer him to the M.O.T.H. position knew that he had filed an administrative complaint. Linda Davidson, Human Resources Supervisor, testified at her deposition that after she received Adams's Charge, which the EEOC forwarded to the company on December 15, 1997, she forwarded it to Ken Ramsey, Industrial Relations manager. Ramsey testified that while he probably received the Charge, he did not actually recall either receiving or investigating it, explaining that during this time period he was dealing with Alcoa, Inc.'s takeover of Alumax, had recently been diagnosed with leukemia, and was married on January 3, 1998 and honeymooning until mid January. Both Casteel and Droege also testified that they did not know that Adams had filed a Charge with

14

the EEOC until after he left the company. Also, Adams testified that while he might have mentioned to Ron Claybrook, another black employee, that he had filed a Charge, he did not tell anyone else at the company; in particular, he did not inform Casteel, Droege, or Ramsey that he had filed the Charge. Thus, Adams sets forth no evidence to indicate that his supervisors, who made the decision to reduce Mill 137's production, requiring his transfer to a M.O.T.H. position, were aware that he had engaged in statutorily protected activity when they made this decision. The Court finds that Adams has failed to establish the required third element of a prima facie case of retaliation with respect to his constructive discharge claim.

The Court's finding is buttressed by Alumax's undisputed evidence of the cost of taking Mill 137 down from three to two shifts, which the company estimates to have been $137,497.00 for the period of January 19, 1998 through February 16, 1998, when the mill was brought back up to three shifts.[4] The significant cost of this reduction in the mill's production suggests that Alumax made this decision for legitimate business reasons, rather than to retaliate against Adams for his filing a charge of discrimination. Although Adams sets forth evidence which indicates generally that the company's manning sheets did not consistently reflect the shifts employees actually worked, he does not offer any evidence which specifically controverts Alumax's presentation of the manning sheets showing that Mill 137 was taken down from three shifts to two during the time period in question. Again, Adams's conclusory assertions that his transfer to a M.O.T.H. position, made necessary by this reduction in Mill 137's production, was a ruse intended to force his demotion are not sufficient to overcome Alumax's undisputed evidence that it indeed took the mill down to two shifts and that to

---

[4]     In his deposition, Casteel explained that Mill 137 was taken down temporarily because the company did not have sufficient orders for the particular product produced by that mill. Adams's mill was 136, but because he lacked seniority, the collective bargaining agreement required that he step down to a M.O.T.H. position and let one of the Mill 137 operators who had lost his shift take over Adams's shift as the operator of Mill 136.

15

do so cost the company a substantial amount of money.[5]  Instead, Alumax's evidence supports the Court's conclusion that Adams has not established a causal connection between his statutorily protected activity and the company's necessary (and temporary) transfer of him from a mill operator to a M.O.T.H. position.  For the foregoing reasons, the Court shall grant summary judgment as to Adams's retaliation, racial harassment, and constructive discharge claims.

Finally, Alumax has moved the Court to strike the affidavits of Ronald Claybrook and John Chaney offered by Adams to support his opposition to summary judgment.  Specifically, Alumax objects to these affidavits as containing inadmissible hearsay statements, opinion, speculation, and other irrelevant and inadmissible evidence.  The Court has reviewed these affidavits and finds that neither their inclusion nor their exclusion from the record before it would change the outcome of its summary judgment rulings.  Therefore, the Court shall deny Alumax's motion to strike as moot without prejudice, leaving the evidentiary issues raised in the motion to be determined as necessary at trial.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Alumax Foils, Inc.'s Motion for Summary Judgment [document #41] is **granted in part** and **denied in part**.

**IT IS FURTHER ORDERED** that Alumax's Motion for Summary Judgment is **GRANTED** as to Plaintiff Jesse Adams's claims in Counts I and II for racial harassment and discharge/ constructive discharge and as to Adams's claims in Count III and IV in their entirety.

---

[5]     For the same reasons, Grandelious's allegations that when he was on the verge of being able to bid from a senior M.O.T.H. position to a mill operator position, the company reduced the shifts on his mill (also Mill 137), disabling him from moving into the mill operator position, do not assist Adams in establishing a causal connection between his filing a discrimination charge and the company's decision to reduce the production Mill of 137.  Alumax points out that Mill 137 was taken down from July 7, 1997 until September 29, 1997, approximately three months after Grandelious bid out of the department, at an estimated cost of $297,375.00 to the company.

**IT IS FURTHER ORDERED** that Alumax's Motion for Summary Judgment is **DENIED** as to Plaintiff Jesse Adams's claims in Counts I and II for failure to promote and for disparate treatment in terms and conditions of employment with respect to Alumax's discipline of Adams for tardiness and absences.

**IT IS FURTHER ORDERED** that Defendant Alumax Foils, Inc.'s Motion to Strike [document #43] is **denied as moot without prejudice**.

Dated this _23rd_ day of November, 1999.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT -- EASTERN MISSOURI
INTERNAL RECORD KEEPING


AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 11/23/99 by mberg
                   4:98cv1542     Adams vs Alumax Foils, Inc.

42:2000e  Job Discrimination (Employment)

Karen Aroesty -   71212              Fax: 314-961-5173
Clyde Craig -   2891                 Fax: 314-961-5173
Stacey Heitzenrater -                Fax: 412-594-5237
Ronald Jenkins -   7127              Fax: 314-721-5525
Margaret Keane -                     Fax: 412-594-5237



SCANNED & FAXED BY:

NOV 2 3 1999

C. L. F.